## Farmers-Exchange Bank of Millersburg v. McDaniel.

(Decided Dec. 18, 1936.)

RAYMOND CONNELL for appellant.

DIXON, BRADLEY & BLANTON for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

Long prior to March 12, 1932, there existed and were being operated two banks in the town of Millersburg, Ky. One of them was incorporated and known as the Exchange Bank and the other as the Farmers Bank. Because of shrinkage in value of assets of each of the institutions, and to escape the liquidation of both, they

began negotiations to consolidate, and a committee of three from each bank was appointed to make an invoice of the assets and liabilities of each corporation. They did so, and in one list they placed what they considered the solvent assets. The amount of those lists of each of the banks bore practically the same ratio to its capital stock. Presumptively the committee made a report to either the directorate of each of the two banks or to their stockholders, but the record discloses no such fact. It is, however, affirmatively shown that no written report was ever made or filed with any one, nor did the committee keep any record or make any minutes of its actions. In furtherance of the negotiations the stockholders of each institution (or the requisite number thereof for the purpose) signed a written agreement and consent for the consolidation in which they said that they "hereby consent that the said two corporations may immediately proceed *through their directors* to effectuate the consolidation to incorporate into one corporation under the name of Farmers-Exchange Bank of Millersburg, Kentucky." (Our italics.) That writing was executed on March 11, 1932, and at a joint meeting of the directorate of the two banks held the next day the consolidation was agreed to be effected on terms set out in a written agreement signed by each director of both banks and styled "Articles of Consolidation," and which was done pursuant to the requirements contained in section 556 of Baldwin's 1936 Revision of Carroll's Kentucky Statutes.

Section, or article III, of that consolidated agreement says: "The consolidated corporation shall take over and succeed to all of the property rgihts, business, credit, assets and effects of the Farmers Bank of Millersburg, Kentucky, and the Exchange Bank of Millersburg, Kentucky, and shall assume all liabilities of said corporations." That document was acknowledged by the directors of each constituent bank and recorded with the secretary of state and with the county court clerk of Bourbon county, all of which, under the provisions of the section of the statutes, supra, had the effect of not only incorporating the consolidated institution under the selected name of Farmers-Exchange Bank of Millersburg, Ky., but also to transfer the assets of each constituent corporation to the consolidated one, and especially so to the extent agreed upon in the articles of consolidation. The consolidated bank immedi-

ately took charge of the real estate of the two constituent banks, as well as their other property, and operated the one consolidated bank until it was closed by proclamation of the President of the United States, and of the then Governor of this Commonwealth in the early part of March, 1933. When those proclamations were lifted, the banking commissioner of Kentucky declined to give his consent for the consolidated bank to further operate as such without strengthening its assets in some manner or plan approved by the law, and acceptable to him. Thereupon it was suggested that the stockholders in the consolidated institution would contribute $20,000 in cash to its assets in order to make them equal to its liabilities, which was demanded by the banking commissioner before it would be permitted to continue in business. That was agreed to by the stockholders, with the further understanding that their stock would be surrendered and new stock issued in the reorganized institution, which was to bear the same name, with the shares increased above its par value by the proportionate amount necessary therefor to make the $20,000 new money paid in. All stockholders desiring to take stock at such valuation were permitted to do so, and the great majority of the old stockholders availed themselves of that right—the agreement for that reorganization further stating that, when completed, the reorganized institution would succeed to the assets of the old consolidated bank. There is no complaint whatever of the regularity or manner in which all of such transactions were effected.

The defendant, John F. McDaniel, was the cashier of the Exchange Bank before the consolidation and had been for a great number of years. He also became president of the consolidated bank and acted as such until its doors were closed pursuant to the two proclamations referred to; but he was not an officer of any kind in the reorganized bank, which reorganization was affected some time in the late spring or early summer of 1933. One Divine was made the cashier of the reorganized bank, and some time after its beginning he learned that McDaniel had in his possession two notes that were executed to the Exchange Bank by William E. Ryan in 1921, and which were secured by the pledge of two life policies on the life of Ryan of $1,000 each—the aggregate amount of his notes being $1,800. Divine also learned that all premiums on the policies had been paid,

either by Ryan or by the Exchange Bank, and possibly one of them by McDaniel after the consolidation was effected, and that the present cash value of the policies amounted to something near $1,300; but the two Ryan notes, as well as the two policies pledged as security therefor, were never turned over to the consolidated bank or to its successor, the reorganized bank.

Demand was then made on McDaniel by the latter bank that he return the Ryan notes with their pledged securities to the reorganized bank as a part of its assets, but he refused to do so, and the bank (the plaintiff herein) then filed this action against him in the Bourbon circuit court to require him to do so, or upon failure thereof to recover judgment against him for the present value of the Ryan indebtedness up to the cash surrender value of the pledged securities. In his answer he denied that the plaintiff was the owner of the Ryan debt—or had any interest in it—for the reason, as was averred by him, that the committee from the two banks, hereinbefore referred to, agreed in making the invoice of assets and liabilities of the two constituent banks that no assets of either of them would be transferred to the consolidated bank, except what the committee selected as being insolvent, and that questionable assets of both institutions, including such as had been theretofore "charged off," should remain the property of the constituent bank that then possessed them, and which, if true, resulted in vesting the old stockholders of those institutions with title thereto. He then averred that he was holding the Ryan notes, with their life policy securities for the use and benefit of the old stockholders of the Exchange Bank, and prayed that the petition be dismissed. Various motions and demurrers were made, some of which were sustained and others overruled, but the subsequent pleadings eventually formed the issue as to whether or not the defense interposed by McDaniel was or was not true—he also having pleaded that the alleged agreement of the committee was omitted from or left out of the later executed Articles of Consolidation by mutual mistake, which allegation was also denied. The proof was heard orally before the court, but was taken down, and transcribed and filed by the stenographer, as a part of the record of the case. The trial judge (a special one) sustained the defense interposed by McDaniel and adjudged that plaintiff was not the owner of the involved indebtedness of

Ryan, and dismissed plaintiff's petition, to reverse which it prosecutes this appeal.

During the progress of the cause, plaintiff made motion for defendant to deliver to the clerk of the court the Ryan notes and the two life policies pledged as their security, which was opposed by defendant, but the court sustained the motion and they were delivered to the clerk of the Bourbon circuit court to await the determination of the cause. Attorneys for both sides argue a number of questions having, perhaps, some collateral bearing upon the issues, but which we deem it unnecessary to either mention or discuss, since we have concluded that the court erroneously interpreted the effect and weight of the testimony heard, whereby it was given reformative effect. The Articles of Consolidation containing the agreement therefor, as well as the terms thereof, expressly provided, as we have seen, for the transfer of all assets of the two constituent corporations to the consolidated one, and that, when done, they passed to and became the property of the reorganized corporation (the present plaintiff) when the reorganization was effected. In order, however, as we have hereinbefore pointed out, to avoid the express stipulation of the Articles of Consolidation to that effect, defendant (as we have said) averred that the committee's agreement therefor was omitted by mutual mistake, and in support thereof McDaniel testified positively (he being a member of the committee from the Exchange Bank) that such was the agreement of the joint committee. Another member of the committee corroborated that testimony to some extent, but he was not so positive as was McDaniel, and his testimony leaves it doubtful if he so understood the conclusions of the committee. The third and last witness introduced to substantiate such alleged agreement by the committee really supported plaintiff's contention that there was none such assented to. But, however that may be, there were some witnesses who disputed defendant's contention by saying that there was no such subject mentioned at the meeting of the joint committee which only assorted the assets of the two consolidating banks, listing the solvent debts of each as well as its insolvent debts, but they (other witnesses) stated that nothing was said or done or any conclusion reached as to what should become of the latter list of debts. We therefore conclude that the

testimony heard upon the trial renders it doubtful if the committee ever reached any such agreement.

In the case of Warfield Natural Gas Co. v. Endicott, 266 Ky. 735, 99 S. W. (2d) 827, this day decided, we had before us the question of the sufficiency of the testimony to authorize the reformation of a written instrument, and in which we held the rule to be (citing many domestic cases in support thereof) that "a written instrument cannot be reformed unless the evidence of mutual mistake is clear and convincing; a preponderance of the evidence is not sufficient." It was taken from a prior case therein referred to.

Besides the cases cited in that (Warfield Natural Gas Company) opinion we referred to the title of Reformation of Instruments in volume 16 of West's Kentucky Digest, for a long list of cases substantiating that proposition. We are convinced that the proof heard in this case did not meet that requirement, and that the court erred in so concluding, although it did not attempt in the judgment appealed from to reform the Articles of Consolidation and then base its judgment on the reformed articles, as correct practice required.

Moreover, if it had been positively shown that the committee did so agree, there is a total dearth of testimony to show that they were so empowered—i. e., to formulate and agree upon terms of consolidation—but only empowered and authorized to make and report a list of solvent and insolvent assets of the two consolidated banks, and their liabilities as forming the basis of consolidation. If, however, it were otherwise, then there is nothing to show that the directors who thereafter signed and agreed upon the terms of consolidation were so informed, or in any manner refused to or declined to carry out that agreement, and which, if true, would not constitute a mistake by leaving out or omitting a portion of the contract that was never submitted to it for incorporation therein. The directorate of the two corporations, the members of which executed the 'Articles of Consolidation, may have, so far as this record shows, declined to surrender to the constituent banks their respective insolvent assets, and, pursuant to that determination stipulated in the articles, in unmistakable terms, the contrary. No director or any other

witness was introduced to prove that at the time of the execution of those articles the question as to whom the continued and future ownership of the insolvent or charged off assets should belong, and, as we have seen, there was no written report by the committee settling such question, nor is there any proof that any oral report to the directorate contained any such settlement. If, therefore, the committee did so agree, so as to leave no doubt upon that subject, then such understanding or agreement at best could or would only be one of recommendation by the committee which was not accepted. The Ryan indebtedness to the Exchange Bank was charged off by that institution in 1925. Its solvency, however, was continuously increasing in proportion to the increase of the cash surrender value of the two life policies, each of which was kept alive.

In addition to the condition of the record as we have outlined it, we cannot escape the conclusion that the alleged agreement of the committee contended for by defendant would be a most unusual one, since it is conceded that both constituent banks at the time, and for some years prior thereto, were more or less financially crippled and their assets seriously impaired by reason of which the list of insolvent or charged off assets would be greatly enlarged, leaving the amount of assets going into the consolidated bank correspondingly reduced. In the circumstances, the proposition insisted upon by defendant would not comport with good business judgment, nor be in harmony with the very undertaking that was sought to be accomplished; i. e., the establishment of a stronger and more solvent bank in the community. We therefore conclude that in no event can it be held that the actual and final agreement between the consolidated banks was as is contended for by defendant, and that all assets as well as liabilities of each constituent bank became vested in and assumed by the consolidated one.

We have already said that the reorganized bank took over the assets of its predecessor, the consolidated one, the reorganized one continuing under the same name. The Ryan notes with the pledged securities were, as we have concluded, an asset of the consolidated bank, and it later became an asset of plaintiff, the reorganized one, thereby vesting in it the right to maintain this ac-

750

tion, and the court erred in adjudging otherwise. Additional facts supporting that conclusion are, that other charged off debts belonging to the constituent banks at the time of the consolidation were turned over to the consolidated bank or its successor and, perhaps, some of them, or portions thereof, were later collected. Also that additional *liabilities* in excess of those listed at the time of the consolidation were later discovered and which were assumed by either the consolidated or reorganized bank, all of which furnish some proof of an interpretation of the terms of consolidation by the parties themselves in accordance with the conclusion above expressed and being the one contended for by plaintiff.

Wherefore, for the reasons stated, the judgment is reversed, with directions to set it aside and to render one conforming to the principles of this opinion.